# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

TREASA A. CROUCH,         )
                              )
      Plaintiff,         )
                              )
      vs.                 )          Case No. 4:04 CV 125 DJS (LMB)
                              )
JO ANNE B. BARNHART,        )
Commissioner of Social Security,    )
                              )
      Defendant.       )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying Treasa A. Crouch's application for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of Complaint (Document Number 9). Defendant has filed a Brief in Support of the Answer. (Doc. No. 11).

### Procedural History

On August 29, 2002, plaintiff filed her application for a Period of Disability and Disability Insurance Benefits, claiming that she became unable to work due to her disabling condition on August 31, 2001. (Tr. 51-53). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated March 31, 2004. (Tr. 41-44, 9-20). Plaintiff then filed a request for review of the ALJ's

decision with the Appeals Council of the Social Security Administration (SSA), which was denied on July 23, 2004. (Tr. 5, 2-4). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481 (2003).

## **Evidence Before the ALJ**

### A.     **ALJ Hearing**

Plaintiff's administrative hearing was held on February 27, 2004. (Tr. 343). Plaintiff was present and was represented by counsel. (Tr. 345). The ALJ began by summarizing the facts surrounding the denial of plaintiff's application for benefits. (Id.). The ALJ stated that plaintiff alleged in her application that she became disabled on August 31, 2001, due to cirrhosis of the liver[1] and peripheral neuropathy,[2] along with some fatigue. (Id.). The ALJ explained that the state agency found that plaintiff had a severe impairment but that plaintiff retained the capacity to perform light work, including her former work as a travel agent. (Id.). Plaintiff agreed with the ALJ's statement of the facts. (Id.).

Plaintiff's attorney then requested that the ALJ leave the record open so that she could obtain the medical records from a podiatrist who had recently performed surgery on plaintiff's foot. (Tr. 346). The ALJ agreed to leave the record open for two weeks. (Id.). The ALJ then admitted a number of exhibits into the record. (Tr. 347).

---

[1]Endstage liver disease associated with failure in the function of cells and interference with blood flow in the liver, frequently resulting in jaundice, hypertension, ascites, and ultimately liver failure. See Stedman's Medical Dictionary, 355 (27th Ed. 2000).

[2]This most common chronic complication of diabetes can cause diminished sensitivity to stimulation (hypesthesia), abnormal acuteness of sensitivity to stimulation (hyperesthesia), abnormal sensations (paresthesia), and loss of temperature and vibratory sense. See Stedman's at 1212.

The ALJ next informed plaintiff that Dr. Morris Alex, a specialist in internal medicine, would be testifying via telephone. (Tr. 348). Plaintiff then asked the ALJ whether it was proper for her to take aspirin when she suffered from liver disease. (Tr. 348-49). The ALJ told plaintiff that she could pose her question to Dr. Alex when he became available. (Tr. 349).

Plaintiff's attorney then examined plaintiff, who testified that she was 52 years of age, was 5 feet 6 inches tall, weighed 146 pounds, and was right-handed. (Tr. 350-51). Plaintiff stated that her weight has increased over the last year. (Tr. 351). Plaintiff testified that she worked for a travel agency until 2001, at which time her legs and feet began bothering her. (Id.). Plaintiff stated that she has not been employed, nor has she sought employment, since 2001. (Id.). Plaintiff explained that she stopped working because her body "ballooned up," due to cirrhosis of her liver. (Tr. 352).

Plaintiff testified that, in addition to the cirrhosis, she suffers from peripheral neuropathy. (Id.). Plaintiff stated that the peripheral neuropathy causes her legs and feet to hurt. (Tr. 353). Plaintiff testified that she engages in exercises to alleviate the pain in her legs and feet. (Id.). Plaintiff stated that the liver disease currently causes fatigue and causes her ankles to swell. (Id.). Plaintiff explained that she typically lies down in bed for a couple of hours every day due to the fatigue and the pain in her legs and feet. (Tr. 353-54). Plaintiff described the pain in her legs and feet as a constant burning sensation, like "being stuck with little ice picks or needles.." (Tr. 354). Plaintiff testified that she experiences some relief in her foot pain by changing shoes four to five times a day and by wearing house slippers. (Id.). Plaintiff stated that her pain has

improved since she has been taking Neurontin.[3]  (Tr. 355).  Plaintiff testified that she also

experiences some relief from applying a topical medication to her feet.  (Id.).

Plaintiff testified that she is able to walk or stand for two to four hours before she

experiences pain or numbness in her feet.  (Tr. 356).  Plaintiff stated that she elevates her feet and

applies ice to them when she experiences pain due to bunionette[4] surgery that was performed on

her feet two weeks prior to the hearing.  (Id.).  Plaintiff testified that when she is sitting down in a

chair she has to change her shoes frequently and move her legs.  (Tr. 356-57).  Plaintiff stated that

she is able to sit for about three hours before she has to change positions.  (Tr. 357).  Plaintiff

testified that she is unable to work at the travel agency because she would have to move around

and change shoes frequently.  (Tr. 357-58).  Plaintiff stated that she has to wear special shoes and

use crutches due to the recent foot surgery.  (Tr. 358).  Plaintiff explained that her recent foot

surgery involved cutting and shaving bone off of each side of her small toe to remove bunionettes.

(Tr. 358-59).  Plaintiff stated that she is able to get around without crutches at home.  (Tr. 359).

Plaintiff testified that she is currently treating with Dr. Bhisit Bhothinard, a neurologist

who recently retired.  (Tr. 359-60).  Plaintiff stated that she consults with Dr. Bhothinard about

every three weeks.  (Tr. 360).  Plaintiff testified that she was hospitalized for her liver problems in

2001 and that the last time she was hospitalized was in July of 2003.  (Id.).  Plaintiff explained

that she was hospitalized most recently because she had two seizures.  (Id.).

Plaintiff stated that the first seizure occurred when she was serving ice cream at a family

---

[3]Neurontin is indicated for the management of severe, throbbing pain in the course or
distribution of a nerve.  See Physician's Desk Reference (PDR), 2590 (59th Ed. 2005).

[4]A localized swelling of the fifth toe caused by an inflammatory bursa.  See Stedman's at
258.

gathering. (Tr. 361). Plaintiff testified that she was taken to the hospital by a family member although she did not think it was necessary to go to the hospital. (Id.). Plaintiff stated that she did not experience any difficulties due to the seizure. (Id.). Plaintiff testified that she underwent a CT scan and that she was not prescribed any medication. (Tr. 362). Plaintiff stated that her second seizure occurred at her mother's birthday party and that she had an indication that the seizure was going to occur. (Tr. 362-63). Plaintiff testified that she was admitted to the hospital for about five days so that tests could be conducted. (Tr. 363). Plaintiff stated that she has not experienced any additional seizures. (Id.).

Plaintiff testified that she has had a couple relapses with regard to her consumption of alcohol. (Id.). Plaintiff stated that when she drinks, she drinks bourbon or vodka, and she consumes four to five drinks. (Tr. 363-64). Plaintiff explained that drinking alleviates the pain in her legs and helps her sleep. (Tr. 364). Plaintiff stated that being around her husband causes her to relapse. (Id.). Plaintiff testified that when she went on a cruise with her sister she did not consume alcoholic beverages. (Id.). Plaintiff stated that her longest period of sobriety was two-and-a-half to three months. (Tr. 365). Plaintiff testified that she has tried programs such as Alcoholics Anonymous, although she prefers to quit on her own. (Id.).

Plaintiff testified that she currently lives with her husband. (Tr. 366). Plaintiff stated that she routinely sweeps, mops, dusts, and prepares meals. (Id.). Plaintiff testified that she occasionally does laundry, although she experiences difficulty walking down the stairs to the basement due to knee problems. (Id.). Plaintiff explained that she has had a kneecap surgically removed due to a birth defect. (Id.). Plaintiff stated that her medical problems have affected her ability to cook elaborate meals and her ability to work in the garden. (Tr. 367). Plaintiff testified

that, due to her knee problems, she cannot squat and must bend from the waist. (Tr. 368). Plaintiff stated that the only places she goes are Kroger, Wal-Mart, and church, and that she goes to these places for the "social experience." (Tr. 368-69). Plaintiff testified that she attends church regularly and goes to the store less frequently. (Tr. 369). Plaintiff stated that she can no longer climb ladders and she experiences difficulty getting in and out of the bathtub. (Tr. 369-70).

The ALJ next examined plaintiff, who testified that she has been unable to squat since 1968, although it has not affected her ability to work because she can bend from her waist. (Tr. 370-71). When the ALJ asked plaintiff whether she could perform her job as a travel agent at that time she responded that she "could try it." (Tr. 371). Plaintiff explained that she could not work on her feet although she was not in too much pain in general to perform her job. (Tr. 372). Plaintiff stated that she could try working if she had a supervisor who allowed her to change shoes frequently. (Id.). Plaintiff testified that she may have to lie down too much during the day in order to complete an 8-hour shift. (Tr. 373).

Plaintiff testified that, at the time of the hearing, she was experiencing "very little" pain due to the Neurontin that she had taken. (Id.). Plaintiff stated that she is also taking Percocet[5] to recover from her foot surgery. (Tr. 373-74). Plaintiff testified that when she is not taking Percocet she rates her neuropathy pain as a five on a scale of five to ten. (Tr. 374). Plaintiff explained that the level of pain she described would require her to lie down. (Id.). Plaintiff stated that on average she lies down four to five times a day for at least a half hour at a time. (Id.).

---

[5]Percocet is indicated for the relief of moderate to moderately severe pain. See PDR at 1223.

Plaintiff testified that when she lies down she reads and she occasionally falls asleep. (Tr. 375). Plaintiff stated that her peripheral neuropathy gets worse in the evenings. (Id.).

Plaintiff testified that when she takes Neurontin, she rates her pain as 20 on a scale of 1 to 100, as long as she changes her shoes frequently. (Id.). Plaintiff stated that she changes shoes four to five times a day. (Tr. 376). Plaintiff testified that she does not know if the level of pain she experiences would prevent her from working as a travel agent. (Id.). Plaintiff stated that her level of pain fluctuates throughout the day due to when her medication takes effect, although the majority of the day her pain level remains at a 20 on a scale of 1 to 100. (Tr. 377-78).

Plaintiff testified that Dr. Brent Tetri treated her for her liver problem when she "filled up with fluid." (Tr. 379). Plaintiff stated that she takes Premarin[6] and Neurontin for her peripheral neuropathy. (Id.). Plaintiff testified that she also takes Vitamin B12,[7] Spironolact,[8] Lasix,[9] Calan,[10] Cyclobenzaprine,[11] Lexapro,[12] Flurazapam,[13] Cephalexin,[14] Percocet, Lorazepam,[15] and

---

[6]Estrogen. See PDR at 3363.

[7]Vitamin B12 can be used to enhance the natural sleep process. See PDR at 3307.

[8]Estrogen. See PDR at 2213.

[9]A diuretic. See PDR at 2343.

[10]Calan is indicated for the relief of hypertension and angina. See PDR at 3100.

[11]Cyclobenzaprine is indicated for the relief of muscle spasm. See PDR at 1930.

[12]Lexapro is indicated for the treatment of major depressive disorder. See PDR at 1282.

[13]Flurazapam is indicated for the treatment of insomnia. See PDR at 3266.

[14]Cephalexin is indicated for the treatment of infection. See PDR at 1872.

[15]Lorazepam is indicated for the treatment of anxiety. See PDR at 2966.

Zinc.[16] (Tr. 380-85). Plaintiff stated that the only medication that produces negative side effects is the Zinc. (Tr. 385). Plaintiff explained that the Zinc causes some burning and nausea, although it does not cause her to vomit. (Id.).

The medical expert, Dr. Morris Alex, next questioned plaintiff regarding her five-day hospitalization. (Tr. 386). Plaintiff testified that no diagnosis was reached regarding her seizures. (Id.). Plaintiff stated that she was told that there was no physiological explanation for the seizures although they could have occurred because she had quit drinking. (Id.). Plaintiff testified that no electroencephalogram[17] was performed and no medication was prescribed. (Tr. 386-87). Plaintiff stated in response to questioning by Dr. Alex that her last liver function studies were performed in July of 2003. (Tr. 387-88). Dr. Alex inquired about plaintiff's bilirubin[18] levels, to which plaintiff's attorney responded that plaintiff's bilirubin level was 2 on July 26, 2003 and 2.6 on July 28, 2003. (Tr. 388). Finally, Dr. Alex asked plaintiff whether she was currently drinking. (Tr. 389). Plaintiff responded that she was not drinking and that she had quit drinking approximately two-and-a-half months prior to the hearing. (Id.).

The ALJ next questioned Dr. Alex, who testified that he could offer a medically certain diagnosis of plaintiff's condition based upon the exhibits and plaintiff's testimony. (Tr. 390). Dr. Alex stated that he first evaluated plaintiff under Listing 4.05, cardiac arrhythmia,[19] and found that

---

[16]Zinc is indicated for vitamin and mineral dietary supplementation. See PDR at 3229.

[17]A system for recording the electric potentials of the brain derived from electrodes attached to the scalp. See Stedman's at 575.

[18]A yellow bile pigment formed from hemoglobin during normal and abnormal destruction of red blood cells. An excess of bilirubin is associated with jaundice. See Stedman's at 202.

[19]Irregular heartbeat. See Stedman's at 128.

she did not meet that listing.  (Id.).  Dr. Alex testified that he next evaluated plaintiff under

Listings 11.02 and 11.03, seizures, and found that she did not meet those listings because the

seizures were caused by alcohol.  (Id.).  Dr. Alex stated that he also evaluated plaintiff under

11.14, peripheral neuropathy, and found that plaintiff's pain had improved since she began taking

Neurontin.  (Tr. 390-91).  Finally, Dr. Alex testified that he evaluated plaintiff under Listing 5.05,

chronic hepatitis,[20] and found that she did not meet that listing because she has not had a bleeding

episode and because her total bilirubin is significant only when she drinks.  (Tr. 391).  Dr. Alex

explained that if plaintiff's bilirubin were still elevated since the time she stopped drinking, then

she would meet the listings for 5.05D.  (Tr. 391-92).

The ALJ next asked Dr. Alex whether plaintiff should avoid Acetaminophen.[21]  (Tr. 392).

Dr. Alex testified that taking small doses of Acetaminophen would not hurt plaintiff, although this

was a decision that plaintiff's physician should make.  (Id.).  Plaintiff then asked Dr. Alex whether

she should avoid aspirin.  (Tr. 392-93).  Dr. Alex responded that taking a low dose of aspirin

would not be harmful.  (Tr. 393).

The ALJ then asked Dr. Alex whether he believed plaintiff had any significant physical

limitations.  (Id.).  Dr. Alex testified that plaintiff only had subjective limitations and that plaintiff

had admitted that she probably could handle a sedentary occupation.  (Id.).  Dr. Alex stated that

the state agency physician who reviewed the evidence found that plaintiff had alcohol cirrhosis

---

[20]Inflammation of the liver persisting for more than six months, often progressing to cirrhosis.  See Stedman's at 808-09.

[21]Acetaminophen is an analgesic that produces analgesia by elevation of the pain threshold. It is equal to aspirin in analgesic and antipyretic effectiveness and it is unlikely to produce many of the side effects associated with aspirin and aspirin-containing products.  See PDR at 1943.

with peripheral neuropathy and tobacco dependence, although he expressed the opinion that plaintiff was capable of engaging in light work activity. (Id.). The ALJ noted that the state agency physician specifically found that plaintiff was capable of lifting 20 pounds occasionally and 10 pounds frequently; and sitting, standing and walking about 6 hours in an 8-hour workday. (Id.).

Dr. Alex testified that the opinion of the state agency physician regarding plaintiff's limitations was "somewhat optimistic" because plaintiff's balance is not good, she lacks sensation in her feet, and she would have difficulty lifting weight. (Tr. 393-94). Dr. Alex testified that he would limit plaintiff's lifting to a maximum of five pounds. (Tr. 394). Dr. Alex also stated that plaintiff should not climb ladders or work around hazardous machinery. (Id.). Dr. Alex testified that plaintiff "absolutely has to stop alcohol." (Id.). Dr. Alex stated that plaintiff could tolerate moderate exposure to cold, wetness, and vibration, although she should not be constantly exposed to extremely cold temperatures. (Tr. 395). Finally, Dr. Alex testified that plaintiff could tolerate extreme heat and vibration. (Id.).

The ALJ next examined the vocational expert, John E. Grenfell, who testified that if plaintiff's testimony regarding her limitations were found to be credible, plaintiff could not perform light, medium, or heavy work. (Tr. 396). Dr. Grenfell stated that, according to plaintiff's own testimony, she could engage in some sedentary work, including work as a travel agent. (Id.). Dr. Grenfell testified that plaintiff should be able to change her shoes four to five times a day as a travel agent and she should not have to lift more than five pounds. (Tr. 397).

The ALJ then asked Dr. Grenfell whether plaintiff would be able to perform her past work if she has the following limitations: lift 20 pounds occasionally, 10 pounds frequently; sit, stand,

and walk about six hours in an eight-hour workday; unlimited in the use of foot and hand controls; no climbing ladders, ropes, or scaffolding; no balancing of the body, squatting, kneeling, or crawling; must avoid moderate exposure to extreme cold, heat, wetness, and vibration; must avoid concentrated exposure to hazardous work settings; and must avoid walking on uneven surfaces or slippery or wet surfaces. (Tr. 397-98). Dr. Grenfell testified that plaintiff could perform her past work as a travel agent with those limitations. (Tr. 398).

The ALJ then asked Dr. Grenfell if plaintiff could perform her past work if she possessed the same limitations as above yet could only lift five pounds and could only be on her feet for four hours in an eight-hour workday. (Id.). Dr. Grenfell testified that plaintiff would still be able to perform her job as a travel agent. (Id.). Dr. Grenfell stated that the job of travel agent exists in significant numbers in the state and national economy, with in excess of 400 travel agents in Missouri and 30,000 travel agents nationally.

The ALJ next asked Dr. Grenfell if plaintiff could perform her past work as a travel agent if she had the same limitations as above but she had to lie down at least twice for up to a half hour in an eight-hour workday. (Tr. 399). Dr. Grenfell testified that plaintiff could not work as a travel agent or any other job with this limitation because no employer would allow an employee to be away from the work station for a half-hour two times in a workday. (Id.).

Plaintiff then asked Dr. Grenfell if he was aware of the hotel and travel index that travel agents use. (Tr. 399-400). Dr. Grenfell responded that he was familiar with the publication because his daughter was a travel agent. (Tr. 400). Plaintiff stated that this publication weighed more than five pounds. (Id.). Plaintiff next asked Dr. Grenfell if he was familiar with statistics regarding the number of travel agencies in the United States that have closed in the last few years.

(Id.).  Dr. Grenfell testified that roughly 30 percent of travel agencies have closed nationally, although he was unaware of the statistics for Missouri.  (Id.).  Plaintiff noted that travel agencies have lost significant business and have experienced decreased commissions due to competition from the Internet.  (Tr. 401).  Plaintiff commented that her former place of employment, Bluff Travel, is still open, although it is experiencing difficulties.  (Tr. 402).

The ALJ then asked Dr. Grenfell if plaintiff had skills that would transfer to jobs other than a travel agent.  (Id.).  Dr. Grenfell testified that a number of businesses and organizations hire staff to arrange travel, and that plaintiff could work in such a position.  (Id.).  Dr. Grenfell stated that plaintiff also possessed the skills to function as a receptionist or a general office worker.  (Tr. 403).

In a final comment, plaintiff noted that she cannot climb down hills and that she cannot walk on ice.  (Id.).  The ALJ then concluded the hearing and stated that he would leave the record open for two weeks so that plaintiff's attorney could obtain medical records from plaintiff's foot surgery.  (Tr. 403-04).                                   .

### B.      Relevant Medical Records

The record reveals that plaintiff  presented to Matthew J. Riffle, M.D. on August 29, 2001, complaining of swelling in her abdomen and legs.  (Tr. 131).  Dr. Riffle noted that plaintiff looked "terrible," and that there was a strong smell of alcohol about her.  (Id.).  He stated that plaintiff was drinking on a daily basis and claims that she cannot stop drinking without becoming

tremulous.  (Id.).  Dr. Riffle's assessment was "recent onset edema[22] and ascites[23] most likely related to alcoholic liver disease."[24]  (Id.).  He noted that plaintiff had been poorly compliant in the past and emphasized to plaintiff the need to stop drinking.  (Id.).  Dr. Riffle prescribed a diuretic,[25] along with medication to help calm plaintiff during her withdrawal.  (Id.).

Plaintiff saw Dr. Riffle again on October 3, 2001, at which time she reported that she had been abstinent from alcohol.  (Id.).  Dr. Riffle's assessment was "end stage alcoholic liver disease with increasing bilirubin," and hypertension.  (Id.).  Dr. Riffle prescribed additional diuretics and instructed plaintiff to abstain from alcohol.  (Id.).

On October 9, 2001, plaintiff was admitted to the hospital for liver failure.  (Tr. 159).  Dr. Riffle noted that plaintiff had developed redness and increased swelling in her legs, or cellulitis, which failed to respond to conservative measures.  (Tr. 160).  Plaintiff was discharged on October 12, 2001, at which time her cellulitis had resolved and she had no significant complaints.  (Tr. 161).

On October 22, 2001, plaintiff presented to Brent A. Tetri, M.D., for further evaluation of her liver disease.  (Tr. 188).  Plaintiff stated to Dr. Tetri that she drank three to six drinks per night for about fifteen years, although her drinking had not interfered with her job as a travel agent.  (Id.).  Upon physical examination, Dr. Tetri found that plaintiff's abdomen was tense with

---

[22]An accumulation of an excessive amount of watery fluid in cells or intercellular tissues. Stedman's at 566.

[23]Accumulation of serous fluid in the abdominal cavity.  See Stedman's at 154.

[24]Cirrhosis that frequently develops in chronic alcoholism characterized in an early stage by enlargement of the liver due to fatty change with mild fibrosis.  See Stedman's at 355.

[25]An agent promoting the excretion of urine.  See Stedman's at 532.

ascites. (Id.). Dr. Tetri's impression was cirrhosis that may be related to her alcohol use. (Id.).

He doubled plaintiff's dose of diuretics and recommended a liver biopsy and a low sodium diet.

(Tr. 188-89).

On November 6, 2001, Dr. Riffle noted that plaintiff was doing "reasonably well," and

that she had no complaints. (Tr. 130). His assessment was "alcoholic liver disease with some

improvement." (Id.). On November 26, 2001, Dr. Riffle found an enlargement of the left lobe of

the liver. (Tr. 129). He recommended a CT scan. (Id.). On December 11, 2001, Dr. Riffle

noted that plaintiff was doing "a little bit better" and that her laboratory results had improved.

(Id.). His assessment was "alcoholic cirrhosis, seems to be holding her own." (Id.).

On January 7, 2002, Dr. Tetri saw plaintiff as a follow-up for her alcoholic cirrhosis.

(Tr. 181). Dr. Tetri found "significant diuresis"[26] and improvement in her ascites. (Id.). Dr.

Tetri's impression was "remarkable improvement with sustained abstinence from alcohol." (Id.).

He recommended a liver biopsy, a hepatitis A vaccine, and decreased her dosage of diuretics.

(Id.). On this same day, plaintiff also presented to Walter A. Parham, M.D., a cardiologist,

because she was diagnosed with atrial tachycardia[27] in 1984 and had not seen a cardiologist in

"quite some time." (Tr. 223). Plaintiff reported to Dr. Parham that she experiences palpitations

approximately once a month that last five to ten minutes and are not debilitating. (Id.). Dr.

Parham ordered a 30-day event monitor to see if she continued to have atrial tachycardia. (Id.).

On February 27, 2002, Dr. Riffle reported that plaintiff was "actually doing well," and that

she had improved in her ability to ambulate and perform daily functions. (Tr. 128). He stated

---

[26]Excretion of urine. Stedman's at 532.

[27]Rapid beating of the heart, originating in the atrium. See Stedman's at 1782.

that liver function studies had almost completely resolved, and that her albumin[28] was essentially normal.  (Id.).  His assessment was "alcoholic liver disease presumably improving with abstention."  (Id.).  Dr. Riffle noted that he had a lengthy discussion with plaintiff, during which he re-enforced the need for her to stop drinking.  (Id.).

Plaintiff saw Dr. Tetri on March 18, 2002, at which time she reported that her level of energy was improving and her itching had resolved.  (Tr. 178).  She complained of some muscle spasms in her legs.  (Id.).  Dr. Tetri noted that a liver biopsy showed well-established cirrhosis, but no significant inflammation because plaintiff had been abstinent since September.  (Id.).  Dr. Tetri's impression was "established alcoholic cirrhosis," with improvement due to her sustained abstinence.  (Id.).

On April 29, 2002, Dr. Riffle reported that plaintiff was doing "reasonably well."  (Tr. 127).  He stated that plaintiff's extremities were normal and her laboratory figures had "completely improved."  (Id.).

Plaintiff saw Dr. Tetri on June 17, 2002, at which time she reported occasional muscle cramps, no increased abdominal girth, and a high level of energy.  (Tr. 175).  Upon physical examination, Dr. Tetri found plaintiff's abdomen to be flat, soft, and nontender, and found no ascites or lower extremity edema.  (Id.).  Dr. Tetri's impression was that plaintiff remained "quite stable from the standpoint of alcoholic cirrhosis."  (Id.).

On June 19, 2002, plaintiff presented to neurologist Bhisit Bhothinard, M.D., complaining of numbness and tingling sensations in her feet and ankles.  (Tr. 228).  Dr. Bhothinard's impression was "peripheral neuropathy of systemic origin that might be related to chronic

---

[28]A type of simple protein.  See Stedman's at 41.

hepatic[29] insufficiency." (Tr. 227). Dr. Bhothinard prescribed Topamax[30] and Vitamin B12 injections. (Id.).

On July 1, 2002, Dr. Bhothinard reported that plaintiff was "getting some improvement." (Tr. 226). Dr. Bhothinard noted that the pain in plaintiff's feet was confined mostly to the bottom of the feet and that she was getting more feeling back at the knees and ankles. (Id.). Dr. Bhothinard increased plaintiff's dosage of Topamax. (Id.).

On July 15, 2002, Dr. Bhothinard noted that plaintiff had had ear surgery and that her ear was healing reasonably well. (Tr. 225). Regarding plaintiff's peripheral neuropathy, Dr. Bhothinard reported that she experienced more tingling in her feet during the night, while during the day she "seems to be compensated reasonably well." (Id.). Dr. Bhothinard continued plaintiff on Topamax and added Neurontin. (Id.).

On August 14, 2002, Dr. Bhothinard reported that plaintiff was "getting good results" from the Neurontin. (Tr. 224). Dr. Bhothinard noted that plaintiff seemed to be "more comfortable overall." (Id.). Dr. Bhothinard advised plaintiff to "get in touch with the social security office to get some assistance since her medical expenses are quite high." (Id.).

On August 26, 2002, Dr. Riffle reported that plaintiff was still doing "reasonably well," and that her extremities were normal. (Id.).

An October 14, 2002 ultrasound of plaintiff's abdomen revealed regression of ascites since a November 27, 2001 study, and a prominent left lobe of the liver suggestive of cirrhosis. (Tr. 288).

---

[29]Relating to the liver. Stedman's at 808.

[30]Topamax is indicated for the relief of seizures. See PDR at 2542.

On October 23, 2002, Dr. Bhothinard reported that plaintiff was doing "reasonably well." (Tr. 234). He stated that plaintiff was taking Neurontin about every 12 hours to control her symptoms. (Id.). Dr. Bhothinard advised plaintiff to drink Gatorade to relieve cramps that she was experiencing. (Id.).

Plaintiff presented to Dr. Riffle on December 3, 2002, complaining of burning, warmth, numbness, and pain in her left leg above the ankle. (Tr. 285). Dr. Riffle's assessment was cellulitis. (Id.). Dr. Riffle noted that plaintiff was going on a cruise, so he gave her a three-day supply of anti-inflammatory medication. (Id.).

On January 15, 2003, Dr. Bhothinard reported that plaintiff was doing well as far as pain in the legs and feet were concerned, although she had "some severe pain at times." (Tr. 231). He also noted that plaintiff was "under distress and has some crying spells." (Id.). Dr. Bhothinard stated that plaintiff had tachycardia and that she was going to be evaluated by a cardiologist. (Id.). He prescribed Celexa.[31] (Id.). In a letter written that same day, Dr. Bhothinard stated that plaintiff's peripheral neuropathy produced pain that was unrelenting at the beginning, yet the pain has been "reasonably well under control" after a series of medication adjustments. (Tr. 233). He noted that although her peripheral neuropathy was not likely to improve significantly, her symptoms could be "subdued to a tolerable level" with appropriate medication. (Id.).

On March 13, 2003, Dr. Bhothinard reported that plaintiff was doing "reasonably well" with the Neurontin. (Tr. 230). Plaintiff's neurological examination was "unremarkable." (Id.). Dr. Bhothinard referred plaintiff to a podiatrist for pain in the fifth toe of her right foot. (Id.).

---

[31]Celexa is indicated for the treatment of depression. See PDR at 1270.

Plaintiff underwent x-rays of her foot, which revealed mild deformities of the fifth toe of each foot. (Tr. 295).

On April 16, 2003, plaintiff saw podiatrist Norman H. Buchman, for treatment of bunionettes on the fifth toe of each foot. (Tr. 292). Dr. Buchman injected each toe with steroids, which provided relief for plaintiff. (Id.). In a letter to Dr. Riffle dated May 2, 2003, Dr. Buchman reported that plaintiff was "literally pain free." (Tr. 293). He indicated that surgery was not an option at that time and that he would treat plaintiff conservatively. (Id.).

On April 22, 2003, plaintiff presented to the hospital after experiencing seizure activity. (Tr. 253). Plaintiff was found to be alert and not agitated upon arrival. (Tr. 250). Plaintiff reported that she had consumed one to two drinks earlier that day. (Id.). Plaintiff was found to have mild tachycardia and mild ataxia.[32] (Id.). A CT scan of the head revealed no abnormalities. (Tr. 248). The clinical impression was new-onset seizure, recent head trauma, and alcoholism with cirrhosis. (Tr. 250).

Plaintiff returned to Dr. Buchman's office on June 4, 2003, and November 11, 2003, complaining of flare-ups of the right toe. (Tr. 292). Dr. Buchman administered injections of steroids and noted that surgery may be necessary. (Id.).

Plaintiff was admitted to the hospital on July 26, 2003, after experiencing a seizure episode. (Tr. 306). Plaintiff reported that she had stopped drinking alcohol one day prior to the episode. (Id.). Plaintiff admitted to hiding alcohol occasionally. (Tr. 308). Plaintiff was given a mild tranquilizer and her alcohol withdrawal symptoms gradually improved. (Tr. 306). She was

---

[32]An inability to coordinate muscle activity during voluntary movement. Stedman's at 161.

assessed with delirium tremens.[33]  (Tr. 309).  It was recommended that plaintiff undergo inpatient

alcohol detoxification.  (Tr. 306).  Plaintiff was resistant to the idea of an inpatient program

although she agreed to an outpatient program.  (Id.).

Plaintiff saw Dr. Riffle on January 8, 2004, complaining of increased swelling.  (Tr. 337).

Dr. Riffle restarted the diuretics.  (Id.).  On a January 29, 2004 follow-up, plaintiff reported that

she was still trying to stop drinking.  (Tr. 338).

Plaintiff presented to Dr. Buchman on January 20, 2004, for re-evaluation and

consultation with regard to her feet.  (Tr. 341).  Dr. Buchman reported that plaintiff had done

"fairly well" with conservative treatment, yet the period of relief continued to get shorter between

treatments.  (Id.).  He stated that plaintiff desired surgical intervention, and that he would review

plaintiff's x-rays to determine whether surgery was warranted.  (Id.).  Plaintiff underwent left and

right fifth bunionectomies[34] on February 10, 2004.  (Tr. 342).

### The ALJ's Determination

The ALJ made the following findings:

1.     The claimant met the disability insured status requirements of the Act on August
       31, 2001, the date the claimant stated she became unable to work, and continues to
       meet them through December 31, 2006.

---

[33]An altered state of consciousness, consisting of confusion, distractibility, disorientation,
disordered thinking and memory, defective perception, and agitation due to alcoholic withdrawal
following a period of sustained intoxication.  See Stedman's at 470.

[34]Excision of a bunion.  Stedman's at 258.

2.      The claimant has not engaged in substantial gainful activity since August 31, 2001.

3.      The medical evidence establishes that the claimant has Cirrhosis of the liver and peripheral neuropathy, but that she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.      The claimant's allegations of symptoms precluding all work are found not credible based on inconsistencies in the record as a whole.

5.      The claimant can sit, stand, and/or walk four hours each in an eight hour workday. She cannot lift more than five pounds; climb ladders, ropes, and scaffolding; balance, kneel, crawl, walk on uneven surfaces; avoid even moderate exposure to extreme cold, wetness, and vibration of the body; and avoid concentrated exposure to hazardous setting.  She had to frequently change her shoes during the day (20 CFR 404.1545).

6.      The claimant's past relevant work as a travel agent is not precluded by the above limitations (20 CFR 404.1565).

7.      The claimant's impairments do not prevent the claimant from performing her past relevant work.  However, should the claimant be unable to perform her past relevant work, she has the residual functional capacity to perform other work.

8.      The claimant has acquired work skills, such as in communication and in working with an understanding of fee travel schedules, making travel arrangements, scheduling, and organizing, which she demonstrated in past work, and which, considering her residual functional capacity, can be applied to meet the requirements of other work (20 CFR 404.1568).

9.      Considering the types of work which the claimant is still functionally capable of performing in combination with her age, education, and work experience, she can be expected to make a vocational adjustment to work which exists in significant numbers in the national economy.  Examples of such jobs are receptionist and general office clerk (420,000 nationally).

10.     The claimant was not under a disability, as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(g)).

(Tr. 19).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the application filed on

August 14, 2002 (protective filing date), the claimant is not entitled to a Period of
Disability or Disability Insurance Benefits under Sections 216(I) and 223, respectively, of
the Social Security Act.

(Tr. 20).

## Discussion

### A.  Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it.  See Mapes v. Chater,

82 F.3d 259, 262 (8th Cir. 1996).  Substantial evidence is less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v.

Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  It is not the court's task "to review the evidence

and make an independent decision."  See Mapes, 82 F.3d at 262.  If, after review, it is possible to

draw two inconsistent positions from the evidence and one of those positions represents the

Commissioner's findings, the denial of benefits must be upheld.  See id.  The reviewing court,

however, must consider both evidence that supports and evidence that detracts from the

Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing

Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into

consideration the weight of the evidence in the record and apply a balancing test to evidence

which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required

has been described as a "searching inquiry."  Id.

### B.  The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied.
See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.
See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See

20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.

See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059

(8th Cir. 1998).

## C.    Plaintiff's Claims on Appeal

Plaintiff raises two claims on appeal of the Commissioner's decision.  Plaintiff first argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible.  Plaintiff also argues that the ALJ erred by disregarding the opinions of plaintiff's treating physicians.

### 1.    Credibility Determination

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible.  Plaintiff specifically argues that the ALJ erred by not properly

considering the Polaski factors in making his determination.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors."  Kelley, 133 F.3d at 588.  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.

Under Polaski, an ALJ must also consider a claimant's prior work record, observations by third parties and treating and examining doctors, and the claimant's appearance and demeanor at the hearing.  739 F.2d at 1322.  In evaluating the evidence of nonexertional impairments, the ALJ is not free to ignore the testimony of the claimant "even if it is uncorroborated by objective medical evidence."  Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984).  The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole.  See Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996).

The court finds that the ALJ's credibility determination regarding plaintiff's subjective

complaints of pain and limitations is supported by substantial evidence in the record as a whole. Plaintiff claims that one "need only review the treatment and clinic notes from The Neurological Clinic to see that Plaintiff has repeatedly returned to them for treatment of liver disease, peripheral neuropathy and renal problems." (Pl. Br. at 9). Plaintiff also cites the fact that plaintiff has been on medication and that plaintiff has complained of pain. (See id.). Plaintiff mischaracterizes the nature of a finding of pain in the medical evidence. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work." Benksin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent her from working are credible.

In this case, the ALJ properly pointed out Polaski factors and other inconsistencies in the record as a whole which detract from plaintiff's complaints of disabling pain. The ALJ began by conducting an exhaustive summary of the medical record. (Tr. 10-14). The ALJ first noted that plaintiff was never prescribed medication for seizures and that doctors told her that there was no physiological cause for her seizures. The ALJ stated that plaintiff's doctors concluded that plaintiff's seizures were related to alcohol. Regarding plaintiff's peripheral neuropathy, the ALJ pointed out that plaintiff has shown significant improvement with Neurontin. Concerning plaintiff's liver disease, the ALJ stated that plaintiff's bilirubin is significant only when she drinks, and that she has only had one episode of ascites, with nothing in her chart to indicate a recurrence.

The ALJ also noted that plaintiff is taking medication to control her impairments. Evidence of effective medication resulting in relief may diminish the credibility of a claimant's

complaints.  See Rose v. Apfel, 181 F.3d 943, 944 (8th Cir. 1999).  The ALJ further noted that plaintiff's medications do not produce severe side effects.  The absence of side effects from medication is a proper factor to be considered in evaluating subjective complaints of pain.  See McKinney v, Apfel, 228 F.3d 860, 864 (8th Cir. 2000).

Notably, the ALJ pointed out that none of plaintiff's physicians have imposed any functional limitations on plaintiff.  The presence or absence of functional limitations is an appropriate Polaski factor, and "[t]he lack of physical restrictions militates against a finding of total disability."  Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999)(citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993)).

The ALJ also discussed plaintiff's testimony.  The ALJ stated that plaintiff testified that she has been sober for two-and-a-half to three months, she can be on her feet for two hours a day, she has to change her shoes frequently, she can stand two to four hours, and she can sit for three hours.  The ALJ pointed out that plaintiff's pain at the time of the hearing was little, with plaintiff rating her neuropathy pain as a five and as a two with medication, on a scale of 1 to 10.  Regarding her daily activities, plaintiff testified that she performs household chores, cooks, shops for groceries, and attends church regularly.  The ALJ noted that plaintiff planned a cruise in December 2002, suggesting that her pain level and general health was sufficient so as to allow her to vacation.  Significant daily activities may be inconsistent with claims of disabling pain.  See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001).

Further, the ALJ pointed out that plaintiff testified that she could probably handle a sedentary position, and that she could return to her travel agency job if she had the opportunity to change her shoes frequently throughout the day.  The ALJ also noted that plaintiff questioned the

vocational expert regarding the reduction in the number of travel agents due to economic changes. The ALJ stated that the thrust of plaintiff's inquiry suggested that she did not feel that she was unable to engage in that type of work, but rather that it did not exist in significant numbers. Finally, the ALJ pointed out that even if plaintiff could not perform her past relevant work, the vocational expert testified that there is other work that she can perform.

The ALJ also discussed plaintiff's work record. Although not controlling on the issue of plaintiff's complaints of disabling pain, a claimant's work history is a proper factor in assessing credibility. See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996). The ALJ acknowledged that plaintiff had a work history that was long and steady. The ALJ noted that plaintiff testified that she quit her job due to bloating caused by her liver disease, and that plaintiff's bloating has since disappeared.

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not credible is supported by substantial evidence. Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

### 2.     Opinions of Treating Physicians

Plaintiff next argues that the ALJ erred in failing to give the proper weight to plaintiff's treating physicians. Specifically, plaintiff argues that the ALJ "arbitrarily disregarded the opinions

of all of Plaintiff's treating physicians." (Pl.'s Br. at 14).

"A treating physician's opinion is generally entitled to substantial weight; however, such an opinion is not conclusive in determining disability status, and the opinion must be supported by medically acceptable clinical or diagnostic data." Grebenick v. Chater, 121 F.3d 1193, 1199 (8th Cir. 1997) (quoting Davis v. Shalala, 31 F.3d 753, 756 (8th Cir. 1994). Further, such opinions may also be discounted when a treating physician renders inconsistent opinions. See Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000). An ALJ is also free to reject the conclusions of any medical source if those findings are inconsistent with the record as a whole. See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001). Opinions of treating physicians may be discounted or disregarded where other "medical assessments are supported by better or more thorough medical evidence." Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997).

Plaintiff claims that the ALJ failed to give appropriate weight to the opinions of plaintiff's treating physicians and instead substituted his own medical opinion concerning the severity of plaintiff's impairments. However, plaintiff fails to indicate which medical opinion the ALJ discredited. The ALJ in fact conducted a very detailed, five single-spaced page summary of all of the medical evidence, including the opinions of plaintiff's treating physicians. (Tr. 10-14). The ALJ did not indicate that he was discrediting the opinions of any of plaintiff's treating physicians. Rather, he accepted all of the medical opinions and diagnoses contained in the record.

Plaintiff does not indicate how the ALJ substituted his own medical opinion in place of the opinions of plaintiff's treating physicians. After conducting a thorough summary of the medical evidence, the ALJ concluded that there was "little in the medical evidence, which indicates that the claimant is totally disabled." (Tr. 16). The ALJ acknowledged that plaintiff suffered liver

damage as a result of alcohol consumption and that plaintiff's peripheral neuropathy was possibly

caused by alcohol consumption as well. The ALJ then recounted plaintiff's testimony that she

was abstinent from alcohol at the time of the hearing. The ALJ noted that plaintiff's medical

records show that when she is abstinent, her liver functions normalize. Further, the ALJ pointed

out that plaintiff's peripheral neuropathy and pain have improved with the medication Neurontin.


The ALJ's statements regarding the severity of plaintiff's impairments are consistent with

the opinions of plaintiff's treating physicians. Plaintiff's treating physicians consistently noted that

plaintiff's liver condition drastically improved with her abstention from alcohol. On November

26, 2001, Dr. Riffle noted that plaintiff was doing better since abstention and that she seemed "to

be holding her own" with respect to her liver condition. (Tr. 129). On January 7, 2002, Dr. Tetri

reported "remarkable improvement with sustained abstinence from alcohol."

(Tr. 181). Dr. Riffle stated that plaintiff's liver function studies had "almost completely resolved,"

and that her albumin was "essentially normal" on February 27, 2002, due to her abstention. (Tr.

128). He commented that plaintiff was "actually doing well," and that she had improved in her

ability to ambulate and perform daily functions. (Id.). On March 18, 2002, Dr. Tetri reported "no

significant inflammation because plaintiff had been abstinent since September." (Tr. 178). On

April 29, 2002, Dr. Riffle stated that plaintiff was doing "reasonably well," and that her laboratory

figures had "completely improved." (Tr. 127).

Further, Dr. Bhothinard, plaintiff's treating neurologist, repeatedly noted the positive

effects of Neurontin on plaintiff's peripheral neuropathy. On August 14, 2002, Dr. Bhothinard

reported that plaintiff was "getting good results" from the Neurontin and that plaintiff seemed to

- 29 -

be "more comfortable overall." (Tr. 224). Dr. Bhothinard found that plaintiff was still doing "reasonably well" and that her extremities were normal, on August 26, 2002. (Id.). On January 15, 2003, Dr. Bhothinard stated in a letter that plaintiff's peripheral neuropathy produced pain that was unrelenting at the beginning, yet the pain has been "reasonably well under control" after a series of medication adjustments. (Tr. 223). He noted that plaintiff's symptoms could be "subdued to a tolerable level" with appropriate medication. (Id.). Dr. Bhothinard also reported that plaintiff was doing "reasonably well" with the Neurontin on March 13, 2003. (Tr. 230).

Plaintiff contends that all of the physicians that treated her "agree that Plaintiff is permanently and totally disabled." (Pl.'s Br. at 13). The record is devoid of support for this proposition. None of plaintiff's treating physicians expressed the opinion that plaintiff was disabled. In fact, none of plaintiff's treating physicians imposed any functional restrictions on plaintiff As the sole support for plaintiff's statement that all of her physicians agree that she is permanently and totally disabled, plaintiff cites Dr. Bhothinard's August 14, 2002 comment that plaintiff should contact the social security office to try to obtain assistance with her medical bills. (Tr. 224). Dr. Bhothinard's comment does not constitute an opinion that plaintiff is "permanently and totally disabled." Even if Dr. Bhothinard's comment could be construed as an opinion that plaintiff is disabled, Dr. Bhothinard's subsequent records describe plaintiff's significant improvement. As previously discussed, Dr. Bhothinard stated that plaintiff's pain was "reasonably well under control" on January 15, 2003. Further, when a physician finds disability, but does not explain the specific nature of a claimant's limitations, the ALJ is free to give the report little weight. See Rhodes v. Apfel, 40 F. Supp.2d at1108, 1119 (E.D. Mo. 1999).

In summary, the ALJ accorded proper weight to the opinions of plaintiff's treating

physicians.  Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's applications for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act be **affirmed**.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this __2nd__ day of August, 2005.

_Lewis M. Blanton_

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE